# UNITED STATES DISTRICT COURT
### for the
## DISTRICT OF NEW HAMPSHIRE

**ROBERT FRESE**

      **Plaintiff,**

  **v.**

**GORDON MACDONALD, in his official capacity only as Attorney General of the State of New Hampshire,**

      **Defendant.**

**Case No.: _____**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

New Hampshire's criminal defamation statute, RSA 644:11, makes it a misdemeanor to "purposely communicate[] to any person, orally or in writing, any information which [the defendant] knows to be false and knows will tend to expose any other living person to public hatred, contempt or ridicule." Robert Frese, an outspoken resident of Exeter, New Hampshire, has twice been arrested and charged with criminal defamation under the statute. Most recently, on May 4, 2018, the Exeter Police Department arrested Mr. Frese and charged him with criminal defamation after he posted online comments stating that Exeter Police Chief William Shupe "covered up for [a] dirty cop."

Criminal defamation statutes like New Hampshire's violate the First Amendment. These laws must be considered "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and

public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Because "erroneous statement is inevitable in free debate," defamation laws must provide the "breathing space" that free expression "need[s] to survive." *Id.* at 271–72 (citation and internal quotation marks omitted). The Supreme Court's "decisions since the 1960's have narrowed the scope of the traditional categorical exceptions for defamation." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992). "The emphasis has shifted from criminal to civil remedies, from the protection of absolute social values to the safeguarding of valid personal interests. Truth has become an absolute defense in almost all cases, and privileges designed to foster free communication are almost universally recognized." *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 151–52 (1967).

Criminal defamation laws like RSA 644:11 are inconsistent with the First Amendment. The standard for determining whether speech is defamatory falls "far short of the reasonable precision necessary to define *criminal* conduct." *Gottschalk v. State*, 575 P.2d 289, 292 (Alaska 1978) (emphasis added). New Hampshire's criminal defamation law gives the public far too little guidance on what may constitute a crime, and gives law enforcement far too much discretion in deciding whom to prosecute. "[T]he fear of being prosecuted under laws prohibiting false speech may deter the promulgation of valuable and protected speech," a concern that "is particularly acute in the context of allegations of police misconduct." *State v. Allard*, 148 N.H. 702, 706 (2003).

The public interest in preventing defamation is insufficient to justify the repressive effect that criminal defamation laws impose on free expression. The award of damages in a civil action provides an adequate remedy for the defamed individual. *See Garrison v. Louisiana*, 379 U.S. 64, 69 (1964). And, although prosecutions for so-called "seditious libel" against the government were known at the time of the Star Chamber in England and the Alien & Sedition Act in the United States, it is now widely recognized that "[t]he Constitution does not tolerate actions for libel on

government." *Rosenblatt v. Baer*, 383 U.S. 75, 91 (1966) (Stewart, J., concurring).

Accordingly, Mr. Frese brings a claim for declaratory and injunctive relief against the State of New Hampshire. He seeks a ruling (i) declaring that RSA 644:11 facially violates the First Amendment and (ii) permanently enjoining the State from enforcing the statute. He further alleges as follows:

## PARTIES

1.      Plaintiff Robert Frese lives in Exeter, New Hampshire.  He has been twice been arrested for and charged with criminal defamation.  These consisted of the following: (i) a prosecution in 2012 by the Hudson Police Department; and (ii) a prosecution in 2018 by the Exeter Police Department.

2.      Defendant Gordon MacDonald is the Attorney General of the State of New Hampshire. He is named in his official capacity.  His office is located at 33 Capitol Street, Concord, NH 03301. The Attorney General is the chief legal officer and chief law enforcement officer of the State.  He exercises "general supervision of the criminal cases pending before the supreme and superior courts of the state, and with the aid of the county attorneys [he] shall enforce the criminal laws of the state." RSA 7:6. Law enforcement officers "shall be subject to the control of the attorney general whenever in the discretion of the latter he shall see fit to exercise the same." RSA 7:11.

## JURSIDICTION AND VENUE

3.      This action arises under the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.  This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

4.      Declaratory relief is authorized by 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

5.     The Defendant is a public official of the State of New Hampshire.  The Defendant resides within this District and/or performs official duties within the State of New Hampshire. This Court, accordingly, has personal jurisdiction over the Defendant.

6.     Venue in the District of New Hampshire is based on 28 U.S.C. § 1391(b).

## FACTS

**Criminal Defamation Laws**

1.     In *Garrison v. Louisiana*, the Supreme Court expressed disapproval of criminal defamation laws, but observed that prosecutions under these laws had long since fallen "into virtual desuetude," as "the civil remedy had virtually pre-empted the field of defamation." 379 U.S. 64, 69 (1964).

2.     Nonetheless, criminal defamation laws remain on the books in 25 states and the U.S. Virgin Islands.   *See* Committee to Protect Journalists, *Critics Are Not Criminals: Comparative Study of Criminal Defamation Laws in the Americas* 25–27 (2016), https://cpj.org/x/675b. Penalties range from $500 to $10,000 and/or ten years in jail for certain offenses, but the typical penalty is $1,000 and/or one year in jail.  *Id.*  Any criminal conviction also carries a number of collateral penalties, including potential immigration consequences and ineligibility for various employment and housing opportunities.

3.     Nationally, criminal defamation charges are disproportionately filed against people who criticize public officials or government employees, especially law enforcement officers.  One study identified 23 criminal defamation prosecutions or threatened prosecutions for the period from 1990-2002, 12 of which were deemed "political," and 20 of which involved public figures or issues of public controversy.  George C. Lisby, *No Place in the Law: The Ignominy of Criminal Libel in American Jurisprudence*, 9 Comm. L. & Pol'y 433, 467 (2004) (citing Russell Hickey, *A*

*Compendium of U.S. Criminal Libel Prosecutions: 1990-2002*, Libel Defense Resource Center Bull., Mar. 27, 2002, at 97)). Another study, focusing on Wisconsin, found that 39 percent of criminal defamation prosecutions involved either public officeholders or government employees, including numerous charges of sexual misconduct by law enforcement and probation officers. David Pritchard, *Rethinking Criminal Libel: An Empirical Study*, 14 Comm. L. & Pol'y 303, 327–33 (2009).

4.     Although criminal defamation prosecutions remain relatively rare, they have increased with the rise of online speech.  Edward L. Carter, *Outlaw Speech on the Internet: Examining the Link Between Unique Characteristics of Online Media & Criminal Libel Prosecutions*, 21 Santa Clara Computer & High Tech. L.J. 289, 298 (2005).  In Wisconsin, one study found that there were 21 criminal defamation prosecutions from 1991 through 1998, or roughly 2.62 per year, none of which involved online speech. Pritchard at 316. From 1999 through 2007, there were 40 criminal defamation prosecutions, 18 of which involved the Internet. *Id.* at 317.

5.     If the trend continues, abetted by calls for government regulation of "fake news," criminal defamation laws could become regular tools for policing online discourse.

**New Hampshire's Criminal Defamation Statute**

6.     New Hampshire's criminal defamation statute, RSA 644:11, provides: "A person is guilty of a class B misdemeanor if he purposely communicates to any person, orally or in writing, any information which he knows to be false and knows will tend to expose any other living person to public hatred, contempt or ridicule."

7.     Criminal defamation under RSA 644:11 is a class B misdemeanor, which carries a maximum penalty of a fine up to $1,200, *see* RSA 651:2, IV(a), plus a twenty-four percent penalty

assessment. Police departments may initiate prosecutions under RSA 644:11 on their own initiative, without input from an attorney. People charged under RSA 644:11 are not entitled to court-appointed counsel if they are indigent.

8.      Records from the New Hampshire Judicial Branch reveal approximately 25 cases between January 1, 2009 and December 31, 2017 in which a defendant was charged with criminal defamation under RSA 644:11.  *See Exhibit A*.

**The 2012 Hudson Police Department Prosecution**

9.      Mr. Frese was first charged with criminal defamation in May of 2012 by the Hudson Police Department for, in part, repeatedly calling a life coach business a "scam" on Craigslist.  *See Exhibit B*, e.g., HUD010, 013-14, 021-22, 024-027, 029-39, and 047-053.

10.     Without the benefit of an attorney to advise him on his legal rights, Mr. Frese pleaded guilty to criminal defamation under RSA 644:11 in August of 2012.   As part of his sentence, Mr. Frese was fined $1,488 (with $1,116 suspended) and ordered to be on good behavior for two years.  *Id.* at HUD003-04.

**The 2018 Exeter Police Department Prosecution**

11.     On May 4, 2018, the *Exeter News-Letter* published online, including on its Facebook page, an article entitled "Retiring Exeter Officer's Favorite Role: Mentoring Youth."

12.     Using the pseudonym "Bob William,"[1] Mr. Frese published a comment to this article on the *Exeter News-Letter*'s Facebook page.  The comment stated, in part, that "[t]his [Officer D'Amato] is the dirtiest most corrupt cop that I have ever had the displeasure of knowing [….] and the coward Chief [William] Shupe did nothing about it." *See Exhibit C*, EXE091.

13.     That day, Chief William Shupe became aware of the comment and emailed the

---

[1] William is Mr. Frese's middle name.

reporter who wrote the article, asking that the comment be removed.  The *Exeter News-Letter* complied and removed the comment.  *See Exhibit C*, EXE084-85.

14.     After the *Exeter News-Letter* deleted Mr. Frese's comment, Mr. Frese submitted another comment under the pseudonym "Bob Exeter." This comment stated in part: "The coward Chief Shupe did nothing about it and covered up for this dirty cop.  This is the most corrupt bunch of cops I have ever known and they continue to lie in court and harass people …. " *See Exhibit C*, EXE092.  This comment was forwarded by Chief Shupe to Detective Patrick Mulholland.  *See Exhibit C*, EXE019 (P. Mulholland May 9, 2018 Police Report, Paragraph 4), EXE026 (P. Mulholland May 23, 2018 Arrest Warrant Affidavit, Paragraph 4).

15.     Mr. Frese's speech was constitutionally protected under the First Amendment.

16.     Detective Mulholland discussed the investigation with Chief Shupe, who "expressed his concern regarding the comments as they are false and baseless and were made in a public forum." *See Exhibit C*, EXE019 (P. Mulholland May 9, 2018 Police Report, Paragraph 6), EXE026 (P. Mulholland May 23, 2018 Arrest Warrant Affidavit, Paragraph 4).  Detective Mulholland and Chief Shupe reviewed the criminal defamation statute, RSA 644:11, and "believed that Frese crossed a line from free speech to a violation of law." *Id.*

17.     Detective Mulholland then spoke with Mr. Frese at the Exeter Police Station on May 8, 2018.

18.     According to police reports, Detective Mulholland discussed the interview with Chief Shupe.  Chief Shupe denied being aware of criminal acts by Officer D'Amato and denied covering up criminal conduct.  Detective Mulholland determined that "no credible information exists to believe that Ofc. D'Amato committed the acts Frese suggests." *See Exhibit C*, EXE020 (P. Mulholland May 11, 2018 Police Report, Paragraph 5), EXE026-27 (P. Mulholland May 23,

2018 Arrest Warrant Affidavit, Paragraph 10).

19.     On May 23, 2018, the Exeter Police Department drafted a complaint alleging that Mr. Frese "purposefully communicated on a public website, in writing, information which he knows to be false and knows will tend to expose another person to public contempt, by posting that Chief Shupe covered up for a dirty cop."  *See Exhibit C*, EXE029 (Complaint).

20.     Detective Mulholland also completed an arrest warrant pursuant to RSA 644:11. *See Exhibit C*, EXE024-27 (P. Mulholland May 23, 2018 Arrest Warrant Affidavit).  The arrest warrant was granted by the 10th Circuit Court—Brentwood—District Division (LeFrancois, J.) on May 23, 2018.  *Id.*

21.     On May 23, 2018, Mr. Frese turned himself into the police, after Detective Mulholland advised him of the warrant.  Mr. Frese was formally charged with criminal defamation under RSA 644:11.  *See Exhibit C*, EXE016 (P. Mulholland May 24, 2018 police report).

22.     Mr. Frese was given a court date of July 10, 2018.  *Id.*  One of Mr. Frese's bail conditions was "no contact with Interested Parties," which barred Mr. Frese from contacting Chief Shupe.  *See Exhibit C*, EXE088. Mr. Frese was also ordered to refrain from possession a firearm, destructive device, dangerous weapon or ammunition, and to refrain from excessive use of alcohol. *See id.*

23.     News about Mr. Frese's arrest and prosecution caused significant public controversy. *See Exhibit C*, EXE069-70.

24.     On June 4, 2018, the New Hampshire Attorney General's Civil Rights Division criticized the Department's decision to arrest and charge Mr. Frese. *See Exhibit C*, EXE008-013 (DOJ June 4, 2018 Memo.).

25.     On June 7, 2018, the Exeter Police Department dismissed Mr. Frese's charge under

RSA 644:11.

26.     At the time of his arrest, Mr. Frese was subject to a "good behavior" condition on a suspended sentence from another case. A conviction under RSA 644:11 could have constituted a violation of "good behavior," and resulted in Mr. Frese's imprisonment.

27.     Based on his two prior arrests under the statute, Mr. Frese reasonably fears future prosecution under RSA 644:11 for his speech. He especially fears that he will be arrested and/or prosecuted for speech criticizing law enforcement and other public officials.

## CLAIM FOR RELIEF

## COUNT I

## 42 U.S.C. § 1983 – FIRST AMENDMENT

28.     All prior paragraphs are incorporated.

29.     The First Amendment to the United States Constitution prohibits abridgment of freedom of speech.

30.     The First Amendment is applied to the states through the Fourteenth Amendment.

31.     RSA 644:11 is unconstitutionally vague. "Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). Because a vague statute that "abut(s) upon sensitive areas of basic First Amendment freedoms . . . operates to inhibit the exercise of (those) freedoms," *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972), courts require a "greater degree of specificity" when evaluating statutes that implicate First Amendment rights, *Buckley v. Valeo*, 424 U.S. 1, 77 (1976).

32.     RSA 644:11 fails to provide the reasonable precision necessary to define criminal

conduct. The statute applies to intentionally false and defamatory statements. Statements that are deliberately false, but are not defamatory are protected under the First Amendment. *United States v. Alvarez*, 567 U.S. 709 (2003). But "[w]hether an utterance is defamatory depends on the values of the listener[,] …. and it is not always easy to predict what will be taken as defamatory." *Gottschalk*, 575 P.2d at 293. Furthermore, even ostensibly false and defamatory statements may be protected speech if they constitute satire, parody, or rhetorical hyperbole. *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 757 (1986).

33.    Thus, although deliberately false and defamatory statements of fact are not protected by the First Amendment, the line between protected speech and unprotected defamation is inherently blurry. As a result, it is often almost impossible for a speaker to determine in advance whether their speech would be considered unprotected defamation or protected expression. Civil law may permit such ambiguities, but criminal laws must be held to a higher standard of definition. *See Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982) (stating that the Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe").

34.    Without a well-defined standard of criminal responsibility, law enforcement officials and juries are given nearly unfettered discretion to apply their own standards. Criminal defamation laws are thus susceptible to arbitrary, uneven, and selective enforcement.

35.    Mr. Frese's recent prosecution under RSA 644:11 demonstrates the problem. On information and belief, individuals throughout New Hampshire routinely violate the criminal defamation statute, but Mr. Frese was arrested and prosecuted because he criticized law enforcement officials. The use of criminal defamation laws to prosecute the government's critics "is both the hallmark and the vice of a vague criminal statute." *Gottschalk*, 575 P.2d at 294–95.

36.     The State's interest in preventing defamation is insufficient to justify the repressive

effects that RSA 644:11 imposes on free expression.

**<u>RELIEF REQUESTED</u>**

WHEREFORE, Plaintiff Robert Frese respectfully requests that this Court:

A.      Declare that RSA 644:11 is facially unconstitutional in violation of the First and
Fourteenth Amendments to the United States Constitution;

B.      Permanently restrain and enjoin the Defendant—including all of Defendant's
officers, troopers, agents, servants, employees, attorneys, and other persons in active concert or
participation with Defendant, including but not limited to every New Hampshire County
Attorney, municipal prosecutor, police prosecutor, or peace officer—from enforcing RSA
644:11;

C.      Award Plaintiff attorneys' fees in this action pursuant to 42. U.S.C. § 1988(b);

D.      Award Plaintiff its costs of suit; and

E.      Grant such other and further relief as this Court deems just and proper in the
circumstances.

Respectfully submitted,

ROBERT FRESE,

By and through his attorneys affiliated with the
American Civil Liberties Union of New Hampshire
Foundation and the American Civil Liberties Union
Foundation,

*/s/ Gilles R. Bissonnette*
Gilles R. Bissonnette (N.H. Bar. No. 265393)
Henry R. Klementowicz (N.H. Bar No. 21177)
AMERICAN CIVIL LIBERTIES UNION OF NEW
HAMPSHIRE
Concord, NH  03301
Tel.:  603.224.5591
gilles@aclu-nh.org
henry@aclu-nh.org

Brian Hauss*
Emerson Sykes*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
ACLU Speech, Privacy, and Technology Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: 212.549.2686
bhauss@aclu.org
esykes@aclu.org

John M. Greabe (N.H. Bar No. 18706)
296 Gage Hill Road
Hopkinton, NH 03229
Tel.: 603.513.5191
john@greabe-law.com

Lawrence A. Vogelman, Esq. (N.H. Bar No. 10280)
NIXON, VOGELMAN, BARRY, SLAWSKY & SIMONEAU,
P.A.
77 Central Street
Manchester, NH 03101
Tel.: 603.669.7070
lvogelman@davenixonlaw.com

*pro hac vice application forthcoming

Date:   December 18, 2018