**UNITED STATES DISTRICT COURT**
**for the**
**DISTRICT OF NEW HAMPSHIRE**

|  |  |
|---|---|
| **ROBERT FRESE** | |
| **Plaintiff,** | |
| **v.** | **Case No.: 1:18-cv-01180-JL** |
| **GORDON MACDONALD, in his official capacity only as Attorney General of the State of New Hampshire,** | |
| **Defendant.** | |

**PLAINTIFF'S OBJECTION TO THE STATE'S MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

STANDARD ...................................................................................................................... 3

ARGUMENT ...................................................................................................................... 4

    I.    Mr. Frese Has Standing to Challenge New Hampshire's Criminal Defamation Law. ........ 4

        A.    Mr. Frese's Speech Is "Arguably" Proscribed by the Criminal Defamation Law. ...... 4

        B.    Mr. Frese Has Alleged a Credible Threat of Prosecution............................................ 7

    II.    The Criminal Defamation Law Is Unconstitutionally Vague. ......................................... 9

        A.    The Criminal Defamation Law Fails to Provide Adequate Notice as to What Speech Is Criminally Proscribed. ........................................................................................ 12

        B.    The Criminal Defamation Law's Broad Sweep Encourages Arbitrary and Selective Enforcement.............................................................................................................. 18

CONCLUSION ................................................................................................................. 25

Plaintiff Robert Frese, by and through his counsel, hereby files this Objection to the Motion to Dismiss filed by Defendant Attorney General Gordon MacDonald (the "State").

## INTRODUCTION

New Hampshire's Criminal Defamation Law makes it a crime to write or say anything that a person "knows to be false and knows will tend to expose any other living person to public hatred, contempt or ridicule." RSA 644:11. Last year, the Exeter Police Department (the "Department") attempted to prosecute Mr. Frese under the law, after he published comments on Facebook stating that Exeter Police Chief William Shupe was "covering up for a dirty cop." The charges were dropped after the case became controversial, and after the New Hampshire Department of Justice ("NHDOJ") shared a memorandum criticizing the prosecution as a violation of Mr. Frese's constitutional rights. But Mr. Frese fears that he will be subject to future prosecutions if he continues to criticize the Exeter Police Department and other government or law enforcement officials. He accordingly brought this lawsuit challenging the Criminal Defamation Law under the First Amendment and the Fourteenth Amendment's Due Process Clause.[1]

The State raises two arguments in support of its Motion to Dismiss. First, the State argues that Mr. Frese does not have standing to challenge the Criminal Defamation Law, because he has not alleged that he intends to violate the statute's terms by communicating a statement he knows to be false. This argument can be easily dismissed. Both the Supreme Court and the First Circuit have held that a plaintiff who has previously been prosecuted or threatened with prosecution

_____

[1] Mr. Frese's Complaint alleged that the Criminal Defamation Law is facially vague and that it violates his rights under the First Amendment. Compl. ¶¶ 28–36. Mr. Frese respectfully requests that the Court construe his vagueness claim as arising under the Fourteenth Amendment's Due Process Clause. Additionally, as discussed at footnote 5, *infra*, Mr. Frese alleges that the Criminal Defamation violates the First Amendment. If the Court concludes that amendment is appropriate, Mr. Frese respectfully requests leave to amend the Complaint.

under a law prohibiting false statements has standing to challenge the statute—even if the plaintiff does not allege an intent to violate the statute by lying. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014); *Mangual v. Rotger-Sabat*, 317 F.3d 45, 56 (1st Cir. 2003). Here, Mr. Frese has twice been prosecuted under the Criminal Defamation Law, including the Department's prosecution against him last year. The State has not disavowed any interest in enforcing the Criminal Defamation Law, which was applied in 25 prosecutions between January 1, 2009 and December 31, 2017, mostly by local police departments. And the Town of Exeter itself refuses even to concede that the Department's recent prosecution against Mr. Frese was a mistake. Given these facts, Mr. Frese reasonably fears that his continued criticism of law enforcement and government officials, including officials in the Exeter Police Department, will result in future prosecutions.

Second, the State contends that Mr. Frese has failed to state a vagueness claim. To the contrary, Mr. Frese has plausibly alleged that the Criminal Defamation Law fails to satisfy the stringent vagueness standard applied to criminal regulations of speech. The Criminal Defamation Law is unconstitutionally vague because it employs an extremely broad common-law standard for civil defamation liability that falls "far short of the reasonable precision necessary to define *criminal* conduct," *Gottschalk v. State*, 575 P.2d 289, 292 (Alaska 1978) (emphasis added), and necessarily chills protected expression. Although the State argues that the law's scienter requirements alleviate any concerns that the law fails to provide adequate notice regarding what constitutes defamation, the Supreme Court has expressly rejected the contention that a scienter requirement can cure an inherently vague standard for criminalizing speech. *See Smith v. Goguen*, 415 U.S. 566, 580 (1974).

Further, the Criminal Defamation Law is unconstitutionally vague for the independent

reason that its sweeping standard encourages arbitrary and selective enforcement. Over the past century, criminal defamation prosecutions have disproportionately been brought against those who criticize law enforcement officers and other public officials. In New Hampshire, police department officers are authorized to initiate criminal defamation prosecutions on their own, without participation by local prosecutors, and defendants have no right to counsel or trial by jury. As a result, criminal defamation prosecutions often receive less legal scrutiny than civil defamation claims, and there is a significant risk that defendants will be criminally convicted for constitutionally protected expression. The danger that the Criminal Defamation Law will be misused by police departments to selectively prosecute their critics is too significant to ignore, as Mr. Frese's recent prosecution demonstrates.

## STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must make factual allegations sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* As this Court has explained, "[i]n analyzing whether dismissal is appropriate, the court must accept as true all wellpleaded facts set forth in the complaint and must draw all reasonable inferences in the plaintiff's favor." *United States v. Isaacson*, No. 09-cv-332-JL, 2011WL 2783993, at *1 (D.N.H. July 15, 2011) (Laplante, J.) (citing *Tasker v. DHL Ret. Sav. Plan*, 621 F.3d 34, 38 (1st Cir. 2010)).

# ARGUMENT

## I. Mr. Frese Has Standing to Challenge New Hampshire's Criminal Defamation Law.

To establish Article III standing, a plaintiff must show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "likel[ihood]" that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List*, 573 U.S. at 157–58 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). In the First Amendment context, "two types of injuries may confer Article III standing without necessitating that the challenger actually undergo a criminal prosecution." *Mangual*, 317 F.3d at 56. The first is when "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution." *Id.* at 56–57 (alteration in original) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). The second is when the plaintiff "is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *Id.* at 57 (quoting *New Hampshire Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996)). Mr. Frese focuses on the first type of First Amendment standing. As explained below, he easily satisfies that standard.

### A. Mr. Frese's Speech Is "Arguably" Proscribed by the Criminal Defamation Law.

To establish First Amendment standing, a plaintiff's future conduct need only be "arguably" proscribed by the statute he wishes to challenge. *See Susan B. Anthony List*, 573 U.S. at 162 (citing *Babbitt*, 442 U.S. at 298 (1979)); *Mangual*, 317 F.3d at 56–57. Mr. Frese has sufficiently alleged an intention to engage in a course of conduct "arguably" proscribed by statute. As Mr. Frese explains in his Complaint, he is "an outspoken resident of Exeter," and he plans on engaging in "speech criticizing law enforcement and other public officials." Compl.

Introduction, ¶ 27. Accordingly, "[b]ased on his two prior arrests under the statute, Mr. Frese reasonably fears future prosecution under RSA 644:11 for his speech." *Id.* ¶ 27.

The Complaint details Mr. Frese's two prior arrests, including the 2018 Exeter Police Department arrest for stating that the Exeter Police Chief "covered up for [a] dirty cop," on Facebook, *see id.* ¶¶ 11–26, and the 2012 Hudson Police Department arrest and conviction for criticizing a life coach business on Craigslist, *see id.* ¶¶ 9–10. Despite these prosecutions, Mr. Frese has no intention of censoring his speech concerning the Exeter Police Department and other government officials. He will continue to express his views on what he believes is a corrupt police department in Exeter—namely, the same speech that has already resulted in his arrest under the Criminal Defamation Law. These allegations are more than sufficient to establish that Mr. Frese will engage in a course of conduct arguably proscribed by the challenged statute. *See Mangual*, 317 F.3d at 58 (holding that a reporter had standing to challenge Puerto Rico's criminal libel statute where "[h]e state[d] an intention to continue covering police corruption and writing articles similar to those which instigated Rivera's threat of prosecution").

The State argues that the standing inquiry is controlled by *Blum v. Holder*, 744 F.3d 790 (1st Cir. 2014), in which the First Circuit held that animal rights activists lacked standing to challenge the Animal Enterprise Terrorism Act because they did not allege that they intended to engage in the sort of violent activity prohibited under the statute. The State contends that Mr. Frese similarly lacks standing, because he has not alleged that he intends to make a knowingly false and defamatory statement, in violation of the Criminal Defamation Law. Mot. to Dismiss at 8. However, both the Supreme Court and the First Circuit have discarded similar arguments with respect to statutes that prohibit knowingly false statements.

In *Susan B. Anthony List v. Driehaus*, which was decided 3 months after *Blum v. Holder*,

the Supreme Court held that Susan B. Anthony List ("SBA") had alleged a credible threat of prosecution in its challenge to an Ohio statute prohibiting certain false statements during the course of a political campaign. The Sixth Circuit had reasoned that, because SBA "can only be liable for making a statement 'knowing' it is false," SBA's insistence that its speech is factually true "makes the possibility of prosecution for uttering such statements exceedingly slim." 573 U.S. at 163. The Supreme Court rejected the Sixth Circuit's reasoning, explaining that standing was based not on whether the speaker subjectively believed his speech to be false under the challenged law, but rather whether the challenged law gave the government discretion to determine whether a speaker's speech was false and whether the government had previously exercised that authority. As the Court explained:

> The Sixth Circuit misses the point. SBA's insistence that the allegations in its press release were true did not prevent the Commission panel from finding probable cause to believe that SBA had violated the law the first time around. And, there is every reason to think that similar speech in the future will result in similar proceedings, notwithstanding SBA's belief in the truth of its allegations. *Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law.*

*Id.* at 163 (emphasis added).

Similarly, in *Mangual v. Rotger-Sabat*, the First Circuit held that a plaintiff reporter had standing to challenge Puerto Rico's criminal libel statute, despite the fact that the plaintiff did not concede that he was going to publish false statements. The district court found that no standing existed because, though the reporter "has manifested his intention to work as a journalist . . . [t]his does not mean … that he will engage in the libelous conduct proscribed by the statute." *Mangual v. Agostini*, 203 F. Supp. 2d 78, 85 (D.P.R. 2002). The district court further noted that "[t]he possibility that he might commit libel is simply too remote or hypothetical to give rise to an imminent injury satisfying the standing requirements." *Id.* The First Circuit expressly rejected

the district court's analysis, holding that the reporter's challenge to the criminal libel law was justiciable because he "averred an intention to continue his work as an investigative journalist, and the recent prosecutions under the criminal libel law indicate a real threat of prosecution for his work." *Mangual*, 317 F.3d at 60.

As *Susan B. Anthony List* and *Mangual* make clear, scienter requirements do not always prevent prosecutions against the innocent or truthful. The government has the discretion to determine whether there is probable cause to believe that a speaker has uttered speech "he knows to be false," RSA 644:11, regardless of the speaker's protestations to the contrary. Thus, at the very least, a plaintiff who has been previously prosecuted under a law prohibiting false statements may reasonably fear future prosecution under the same law, even if he has no intention of lying. The same principle applies here. Though Mr. Frese believes that his speech criticizing government officials is truthful, that fact did not protect him before, and he continues to face a real threat of prosecution now. Given Mr. Frese's prior arrests, "there is every reason to think that similar speech in the future will result in similar proceedings, notwithstanding [his] belief in the truth of [his] allegations." *Susan B. Anthony List*, 573 U.S. at 163.

## B. Mr. Frese Has Alleged a Credible Threat of Prosecution.

Mr. Frese also satisfies the "extremely low" credible threat standard because he has already been prosecuted under the Criminal Defamation Law on two separate occasions. This history of past enforcement establishes a credible threat of future prosecution. *See id.* at 164 ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)); *see also, e.g.*, *City of Houston v. Hill*, 482 U.S. 451, 459 n.7 (1987) (". . . 'Hill's record of arrests under the ordinance and his adopted role as citizen provocateur' give Hill standing to challenge the facial validity of

the ordinance.").

The State of New Hampshire, which is represented principally by local police departments and prosecutors in circuit court proceedings, continues to actively prosecute people under the Criminal Defamation Law.[2] It has brought approximately 25 cases between January 1, 2009 and December 31, 2017 in which a defendant was charged with criminal defamation. Compl. ¶ 8. The Criminal Defamation Law is therefore being actively enforced, and does not have "a long institutional history of disuse, bordering on desuetude." *Mangual*, 317 F.3d at 57; *see also Susan B. Anthony List*, 573 U.S. at 164; *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 306 (1st Cir. 2003) (explaining that a "real and immediate threat" of injury may be demonstrated through an "offending policy [that] remains firmly in place"). The active enforcement of the Criminal Defamation Law, including the two prosecutions against Mr. Frese himself, demonstrates that the prospect of future criminal prosecution is "far from 'imaginary or speculative.'" *Susan B. Anthony List*, 573 U.S. at 164 (quoting *Babbitt*, 442 U.S. at 298).

The State's Motion to Dismiss also demonstrates that the Department of Justice intends to vigorously defend the Criminal Defamation Law, and that it has no intention of either disavowing the statute or directing local prosecutors and police departments to cease enforcement. The State's willingness to stand by the statute confirms Mr. Frese's reasonable fear of future prosecution. *See Babbitt*, 442 U.S. at 302 ("Moreover, the State has not disavowed any intention of invoking the criminal penalty provision against [entities] that [violate the statute]."); *New Hampshire Right to Life*, 99 F.3d at 17 ("[T]he defendants have not only refused to disavow [the statute] but their defense of it indicates that they will someday enforce it.").

---

[2] As the State acknowledges, "the vast majority of crimes"—including criminal defamation— "are investigated and charged at the local level by local law enforcement without attorney general involvement." Mot. to Dismiss at 2 n.1.

Mr. Frese also has "a credible fear of having criminal charges filed against him by the local police, whom he has accused of corruption, and other government officials similarly accused." *Mangual*, 317 F.3d at 59. The Town of Exeter refuses to concede that its most recent prosecution of Mr. Frese was mistaken. As *Seacoast Online* reported following a settlement between Exeter's insurer and Mr. Frese concerning the 2018 incident:

> [Exeter Select Board] Chairwoman Julie Gilman said "outside pressure" from groups like the ACLU may have forced Primex's [the Town's insurer] hands in agreeing to settle Frese's complaint. "My first instinct is this is too bad, I would've liked to take the matter further," Gilman said. "We had done no harm and *I think we could've prevailed in court*." ….

> [Selectwoman] Surman said she was surprised by Primex's decision to settle and voiced support for the Police Department. "The bigger issue is this *was a business decision* by Primex to prevent further legal expenses," she said."[3]

Exeter's refusal to concede error suggests that it will continue enforce the Criminal Defamation Law against Mr. Frese when he continues to criticize the Exeter Police Department.

## II. <u>The Criminal Defamation Law Is Unconstitutionally Vague.</u>

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56–67 (1999)); *accord, e.g.*, *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 13–14 (1st Cir. 2011); *Butler v. O'Brien*, 663 F.3d 514, 518 (1st Cir. 2011). Of these two requirements, "the more important aspect of vagueness doctrine 'is . . . the requirement that a legislature establish

---

[3] *See* Alex LaCasse, "Exeter Settles Wrongful Arrest Claim for $17,500," *Seacoast Online*, Feb. 21, 2019 (emphases added), https://bit.ly/2J8i8G8.

minimal guidelines to govern law enforcement.'" *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith*, 415 U.S. at 574). Thus, even a law that is not formally vague may violate due process if it is too easily susceptible to abuse by government officials.

Two thumbs are placed on the scale when assessing a vagueness challenge to a criminal regulation of speech, such as the Criminal Defamation Law. First, although the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties," *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982), it has made clear that "[c]riminal statutes must be scrutinized [for vagueness] with particular care," *City of Houston*, 482 U.S. at 459. This is because civil penalties are "qualitatively less severe" than criminal convictions, *Hoffman Estates* at 499, and because vague criminal statutes "permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender*, 461 U.S. at 358 (quoting *Smith*, 415 U.S. at 575).[4]

Second, laws regulating speech are subject to a "more stringent vagueness test" than laws regulating conduct. *Hoffman Estates*, 455 U.S. at 499. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 604 (1967) (internal quotation marks omitted) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). The heightened vagueness standard applied to laws regulating speech is necessary, both to "ensure that ambiguity does not chill protected speech," *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012), and

---

[4] The "stigma" the Criminal Defamation Law imposes "is not trivial." *Lawrence v. Texas*, 539 U.S. 558, 560 (2003). "Although the offense is but a minor misdemeanor, it remains a criminal offense with all that imports for the dignity of the persons charged, including notation of convictions on their records and on job application forms[.]" *Id.*; *see also, e.g.*, Alexandra Natapoff, *Misdemeanors*, 85 S. Cal. L. Rev. 1313, 1323–27 (2012) (describing the various collateral consequences of misdemeanor criminal convictions). The Supreme Court has invalidated numerous misdemeanor statutes on vagueness grounds. *See Morales*, 527 U.S. at 47 n.2; *Kolender*, 461 U.S. at 353 n.1; *Smith*, 415 U.S. at 569 n.3.

because "there are enhanced concerns about arbitrary enforcement under the void for vagueness doctrine where there is the 'potential for arbitrarily suppressing First Amendment liberties[.]'" *Butler*, 663 F.3d at 520 (quoting *Kolender*, 461 U.S. at 358).

Thus, in *American Civil Liberties Union v. Reno*, the Supreme Court took an especially hard look at the Communications Decency Act's prohibition on "indecent" communication on the Internet, for two compelling reasons. First, as a "content-based regulation of speech," the Act "raise[d] special First Amendment concerns because of its obvious chilling effect on free speech." 521 U.S. 844, 871–72 (1997). Second, the "severity of criminal sanctions," including the "opprobrium and stigma of a criminal conviction," threatened to "cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Id.* at 872. "As a practical matter, this increased deterrent effect, coupled with the 'risk of discriminatory enforcement' of vague regulations, pose[d] greater First Amendment concerns than those implicated by the civil regulation reviewed in *Denver Area Ed. Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 [1996]." *Id.* (parallel citation omitted).

The same principles require the application of the most stringent vagueness scrutiny to the Criminal Defamation Law. The law cannot satisfy this demanding standard. First, the line between actionable defamation and protected expression has become too abstruse to put ordinary people on notice when their speech might have criminal consequences. Second, the exceedingly broad sweep of the Criminal Defamation Law, combined with the minimal procedural protections afforded to defendants charged under the law, creates a significant risk that the law will be abused to prosecute the critics of government officials. The experience of Mr. Frese— who was prosecuted by the Exeter Police Department after criticizing its police chief, despite the total absence of evidence that he believed the statements to be false—confirms that the Criminal

Defamation Law is easily susceptible to misuse. Either of these reasons suffices to declare the Criminal Defamation Law unconstitutionally vague.[5]

A. **The Criminal Defamation Law Fails to Provide Adequate Notice as to What Speech Is Criminally Proscribed.**

Fair notice is "the first essential of due process." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926). "[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning." *Grayned*, 408 U.S. at 108 & n.3 (collecting cases).

The Supreme Court's decision in *Ashton v. Kentucky* is instructive. There, the defendant was convicted of common law criminal defamation for criticizing the local police chief, sheriff, and a newspaper owner. The trial court defined criminal defamation as "any writing calculated to create disturbances of the peace," and instructed the jury that falsity and malice were also essential elements of the offense. 384 U.S. at 198. The Kentucky Court of Appeals upheld the

---

[5] The State argues that the Criminal Defamation Law is constitutional because it satisfies the "actual malice" requirement set forth in *Garrison v. Louisiana*, 379 U.S. 64 (1964). Even a statute that satisfies the requirement set forth in *Garrison* can be unconstitutionally vague under the Due Process Clause, as the Supreme Court made clear in in *Ashton v. Kentucky*, 384 U.S. 195 (1966), discussed *infra*. But, to the extent *Garrison* holds that a criminal defamation law complies with the First Amendment if it includes an actual malice requirement, the case was wrongly decided. In *United States v. Alvarez*, 567 U.S. 709, 723 (2012), the Supreme Court expressed serious concern about laws that broadly criminalize false speech, given the inherent chilling effect such laws have on protected expression. The governmental interest in preventing defamation is insufficient to justify the repressive effect that the Criminal Defamation Law imposes on protected expression, especially since the award of damages in a civil action provides an adequate remedy for private defamation. *See Garrison*, 379 U.S. at 69. Alternatively, the Criminal Defamation Law is facially overbroad because it criminalizes defamation of government officials, also known as "seditious libel." *See id.* at 80 (Black, J., concurring) ("[U]nder our Constitution there is absolutely no place in this country for the old, discredited English Star Chamber law of seditious criminal libel."); *see also Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting). *Garrison* should therefore be overruled, and Mr. Frese's First Amendment claim against the Criminal Defamation Law should be upheld.

conviction under a different standard, but the Supreme Court held that the trial court's definition was operative because that was the one under which the trial was conducted. *Id.* (citing *Shuttlesworth v. City of Birmingham*, 382 U.S. 87 (1965)). The Court "agree[d] with the dissenters in the Court of Appeals who stated that: '. . . since the English common law of criminal libel is inconsistent with constitutional provisions, and since no Kentucky case has redefined the crime in understandable terms, and since the law must be made on a case to case basis, the elements of the crime are so indefinite and uncertain that it should not be enforced as a penal offense in Kentucky.'" *Id.*

The Supreme Court explained that criminal laws regulating speech must be closely scrutinized for vagueness "lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer." *Id.* at 200 (footnote collecting cases omitted). "Such a law," the Court held "must be 'narrowly drawn to prevent the supposed evil,' and that a criminal conviction for an utterance 'based on a common law concept of the most general and undefined nature,' could not stand." *Id.* at 201 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 307–08 (1940)). The Court accordingly held that the common law standard applied by the trial court was unconstitutionally vague. *Id.*[6]

New Hampshire's Criminal Defamation Law is likewise based on a "common law concept of the most general and undefined nature," as *Gottschalk v. State* makes clear. There, the Alaska Supreme Court held that the state's criminal defamation law was unconstitutionally

---

[6] In *How v. City of Baxter Springs*, a federal district court in Kansas rejected a vagueness challenge to that state's criminal defamation law, stating that dicta in *Ashton* expressly approved the Kentucky Court of Appeals' proposed definition of criminal libel, which defined the offense as "the publication of a defamatory statement about another which is false, with malice." 369 F. Supp. 2d 1300, 1305 (D. Kan. 2005). But as at least two appellate courts have confirmed, *Ashton* instead approved the dissenters on the Kentucky Court of Appeals, who argued that the common law of criminal libel was too vague to be enforced as a penal offense at all. *See Tollett v. United States*, 485 F.2d 1087, 1097 (8th Cir. 1973); *Gottschalk*, 575 P.2d at 294.

13

vague, as well as overbroad. Because the statute did not define what constitutes defamation, the court applied the common law definition: "[A]ny statement which would tend to disgrace or degrade another, *to hold him up to public hatred, contempt or ridicule*, or to cause him to be shunned or avoided[.]" 575 P.2d at 292 (emphasis added). The court concluded that this standard fell "far short of the reasonable precision necessary to define criminal conduct." *Id.*

As *Gottschalk* observed, "[e]stablishing a standard against which potentially defamatory statements may be measured generates considerable difficulty in a democratic society which prides itself on pluralism." *Id.* at 293 n.11. "Whether an utterance is defamatory depends on the values of the listener," and even in a "homogeneous culture these values will not be uniform, and it is not always easy to predict what will be taken as defamatory." *Id.* at 293. For example, "labeling someone a 'communist' or a 'marxist' . . . has been considered first defamatory, then non-defamatory, and next defamatory again, depending largely on United States foreign policy changes." *Id.* at 293 n.11 (citing William Prosser, *Handbook on the Law of Torts* § 111, 744 nn.3, 4 (4th ed. 1971)); *see also State v. Shank*, 795 So.2d 1067, 1070 (Fla. Dist. Ct. App. 2001) (holding that a statute criminalizing publications that tended to expose persons to hatred, contempt or ridicule was unconstitutionally vague because "ridicule," "contempt," or "hatred" may arise from different situations depending on the recipient of the communication).[7]

The slipperiness of the defamation standard has significant implications for First

---

[7] The vagueness of the defamation standard is exacerbated here because the Criminal Defamation Law defines the "public" to include "any professional or social group of which the victim of the defamation is a member," without even defining what constitutes a "social group." RSA § 644:11. Since it is "often true that one man's vulgarity is another's lyric," *Cohen v. California*, 403 U.S. 15, 25 (1971), different professional and social groups will naturally have different, sometimes conflicting, standards for what constitutes defamation. The Criminal Defamation Law effectively incorporates every one of these standards as a potential yardstick for criminal conviction.

Amendment freedoms, since the Supreme Court has held that even false statements are constitutionally protected speech if they are not defamatory. *See United States v. Alvarez*, 567 U.S. 709 (2012). And the question of whether a communication includes a defamatory statement of fact is further complicated because the Supreme Court's "decisions since the 1960's have narrowed the scope of the traditional categorical exceptions for defamation." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1982) (citations omitted). For instance, "[t]he common law rule that an expression of [pure] opinion . . . may be the basis of an action for defamation now appears to have been rendered unconstitutional by U.S. Supreme Court decisions," while statements of opinion that imply undisclosed defamatory facts remain unprotected. Restatement (Second) of Torts § 566, comment c (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974)).

Courts must therefore determine "whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct." *Id. See also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (statements that "cannot reasonably be interpreted as stating actual facts about an individual'"—such as parody, ridicule, imaginative expression, and rhetorical hyperbole—are all constitutionally protected and may not be subject to defamation liability). As the First Circuit has recognized, "[t]he determination of whether a statement is one of opinion or fact . . . is difficult to make and perhaps unreliable as a basis for decision." *Bose Corp. v. Consumers Union of U.S., Inc.*, 692 F.2d 189, 194 (1st Cir. 1982) (citing Prosser, *supra*, at 820), *aff'd*, 466 U.S. 485 (1984). Although this common-law judicial line drawing is necessary to resolve civil disputes, it is inappropriate for criminal regulations of speech. *See Reno*, 521 U.S. at 872.

The State argues that any vagueness inherent in the Criminal Defamation Law is cured by

its scienter requirement. *See* Mot. to Dismiss at p. 12. The State relies principally on a trio of out-of-circuit decisions concerning as-applied vagueness challenges to federal drug trafficking laws, all of which include narrowly defined scienter requirements that substantially limited each statute's scope with respect to constitutionally unprotected conduct. For example, in *United States v. Collins*, the defendant argued that the Drug Abuse Prevention and Control Act is unconstitutionally vague because it "fails to define 'knowingly or intentionally … to possess with intent to . . . distribute . . . a controlled substance.'" 272 F.3d 984, 988 (7th Cir. 2001) (citing 21 U.S. § 841(a)(1)). The court concluded that the statute was not vague as applied to a defendant who allegedly entered into an agreement to distribute crack cocaine—because the statute's "absolute prohibition against the manufacture, use and possession of controlled substances provides an explicit warning against dealing with any quantity" of a controlled substance, and because the defendant "would be convicted only if he deliberately agreed to undertake this activity." *Id.* at 989.[8]

These drug-trafficking decisions are not applicable to Mr. Frese's First Amendment challenge to the Criminal Defamation Law. Whereas the drug trafficking laws concern the possession, manufacture, or distribution of controlled substances specifically identified by statute, the Criminal Defamation Law may be invoked to prosecute speech itself—including speech about public officials, such as the Exeter Police Chief—if the government concludes that the speech is false and that it meets the fickle common-law test for defamatory meaning. A

---

[8] *See also United States v. Mire*, 725 F.3d 665, 674 (7th Cir. 2013) (rejecting defendants' as-applied notice challenge to the Controlled Substances Act, because the government was required to demonstrate that the that the defendants "had actual knowledge that khat—fresh or dried—contains a controlled substance"); *United States v. Klecker*, 348 F.3d 69, 72 (4th Cir. 2003) (rejecting defendant's as-applied vagueness challenge to the Controlled Substance Analogue Enforcement Act, because evidence demonstrated that the defendant "was actually aware that Foxy was a controlled substance analogue").

scienter requirement cannot dispel the vagueness inherent in such a Protean standard. *See Smith*, 415 U.S. at 580 (rejecting the government's contention that a statute criminalizing contemptuous treatment of the flag would survive vagueness review if limited to intentionally contemptuous treatment, because this construction of the statute still would not sufficiently "clarify what conduct constitutes contempt, whether intentional or inadvertent").

*Ashton* presents a much closer analogue to the present case. There, the Supreme Court held that Kentucky's common law of criminal defamation was unconstitutionally vague, even though it required the government to demonstrate *both* that the defendant spoke with actual malice and that the statement was "*calculated* to create disturbances of the peace." 384 U.S. at 200 (emphasis added). The Court held that criminalizing statements "'calculated to create disturbances of the peace' leaves wide open the standard of responsibility," notwithstanding the crime's express scienter requirement, because it "involves calculations as to the boiling point of a particular person or a particular group." *Id.*

*Ashton* is a specific application of the principle that predicating criminal liability for speech solely on questions of the speaker's intent and the speech's reception by its audience, without a narrow and clearly defined limiting principle, "would afford 'no security for free discussion.'" *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 467 (2007) (quoting *Buckley v. Valeo*, 424 U.S. 1, 43 (1976)). A sweeping intent-and-effect standard for criminal liability, such as the one set forth in the Criminal Defamation Law, "puts the speaker in these circumstances wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning. Such a distinction offers no security for free discussion. . . . [I]t blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim." *Thomas v. Collins*, 323 U.S. 516, 535 (1945).

Those concerns control here as well. Although the Criminal Defamation Law ostensibly applies only to intentionally false and defamatory statements, "it still ranges very broadly," and "that breadth means that it creates a significant risk of First Amendment harm." *Alvarez*, 567 U.S. at 736 (Breyer, J., concurring in the judgment). In particular, the Criminal Defamation Law's breadth creates "a risk of chilling [valuable speech] that is not completely eliminated by *mens rea* requirements; a speaker might still be worried about being *prosecuted* for a careless false statement, even if he does not have the intent required to render him liable," *id.*, which is exactly what happened to Mr. Frese. Thus, "the fear of being prosecuted under laws prohibiting false speech may deter the promulgation of valuable and protected speech," a concern that is "particularly acute in the context of allegations of police misconduct" or other forms of government malfeasance. *State v. Allard*, 148 N.H. 702, 706 (2002); *see also Tollett*, 485 F.2d at 1096 & nn.20, 21. The danger that the Criminal Defamation Law's vague standard will chill speech on matters of public concern provides one reason for striking it down.

**B. The Criminal Defamation Law's Broad Sweep Encourages Arbitrary and Selective Enforcement.**

Even if the Criminal Defamation Law were not vague in the classical sense that it fails to provide adequate notice of what speech is criminalized, it would *still* be unconstitutionally vague for the independent reason that it is highly susceptible to arbitrary enforcement. *Gottschalk*, 575 P.2d at 294–95. "Perhaps the most meaningful aspect of the vagueness doctrine is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement," so that officials may not abuse a wide-ranging standard "to pursue their personal predilections." *Smith*, 415 U.S. at 574; *accord Kolender*, 461 U.S. at 352. The "need to eliminate the impermissible risk of discriminatory enforcement" is especially important with respect to criminal regulations of speech, "for history

shows that speech is suppressed when either the speaker or the message is critical of those who enforce the law." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051 (1991) (citations omitted).

Experience has long demonstrated that criminal defamation laws are susceptible to precisely this sort of abuse. "Defamations are the stock-in-trade of loose talk, both oral and written, and few indeed are the loose talkers who go through a week without making a statement which if legally tested would satisfy the law's definition of defamatory crime." Robert A. Lefler, *The Social Utility of the Criminal Law of Defamation*, 34 Tex. L. Rev. 984, 984 (1956). Writing in 1956, Dean Lefler concluded that criminal defamation is "committed in this country a thousand times, and possibly ten or twenty thousand times, daily." *Id.* With the advent of the Internet and mass communication, that number has risen dramatically. If criminal defamation laws were vigorously and impartially enforced, prosecutions would be ubiquitous. Yet although criminal defamation laws continue to be sporadically enforced, prosecutions remain infrequent.

The prosecutions that have been brought over the past century "fall into [a] fairly definite pattern that helps to explain what is happening[.]" Leflar, 34 Tex. L. Rev. at 985. Surveying the 110 reported criminal defamation prosecutions from 1920 through 1955, Dean Leflar found that "[n]early half . . . can be classified as basically political." *Id.* Many of these cases involved "prosecutions of persons who, feeling aggrieved, made disagreeable statements about persons firmly entrenched in public office or power." *Id.* at 986. Dean Leflar concluded that the criminal defamation laws were not invoked "against persons or groups in positions of influence or power," but rather were "used on behalf of such persons and groups against their detractors who were less fortunately situated." *Id.* at 1032. *See also* Note, *Constitutionality of the Law of Criminal Libel*, 52 Colum. L. Rev. 521, 533 (1952) ("The criminal libel cases of the present day indicate . . . that this almost obsolete action is being used by the authorities as a form of reprisal

against those who criticize misconduct in office.").

Nor has the skew changed appreciably over the past several decades. One study of 77 criminal defamation investigations and prosecutions from 1965 through 2002, found that 68.8 percent of cases involved "statements about public officials, public figures, or matters of public concern." *Criminalizing Speech About Reputation: The Legacy of Criminal Libel in the U.S. After* Sullivan & Garrison, 37–38, Media Law Resource Center Bulletin (Mar. 2003). It also found that law enforcement officers and elected officials were the two most frequent complainants, comprising 19.5 percent and 14.3 percent of cases, respectively. *Id.* at 38. Another study identified 23 criminal defamation prosecutions or threatened prosecutions for the period from 1990–2002, 12 of which were deemed "political," and 20 of which involved public figures or issues of public controversy. George C. Lisby, *No Place in the Law: The Ignominy of Criminal Libel in American Jurisprudence*, 9 Comm. L. & Pol'y 433, 467 (2004) (citing Russell Hickey, *A Compendium of U.S. Criminal Libel Prosecutions: 1990-2002* at 97, Libel Defense Resource Center Bulletin (Mar. 27, 2002)). Yet another study, focusing on Wisconsin, found that 39 percent of criminal defamation prosecutions involved either public officeholders or government employees, including numerous allegations of sexual misconduct by law enforcement and probation officers. David Pritchard, *Rethinking Criminal Libel: An Empirical Study*, 14 Comm. L. & Pol'y 303, 327–33 (2009). "This pattern of selective enforcement is both the hallmark and the vice of a vague criminal statute." *Gottschalk*, 575 P.2d at 295.

The particular characteristics of New Hampshire's misdemeanor criminal process exacerbate the Criminal Defamation Law's susceptibility to misuse. Because criminal defamation is a Class B misdemeanor, RSA § 644:11, state law authorizes police officials to initiate criminal defamation cases without the participation of a licensed prosecutor. *State v.*

*Aberizk*, 115 N.H. 535, 535 (1975) (citing *State v. Urban*, 98 N.H. 346 (1953)); *see also* RSA § 41:10-a ("Nothing in this section shall be construed to prohibit the state police from prosecuting any violation or misdemeanor in any district or municipal court in this state." (footnote omitted)). Police officers may also testify as witnesses in misdemeanor cases while acting as prosecutor. *Aberizk*, 115 N.H. at 535–36 (citing *State v. LaPalmer*, 104 N.H. 97 (1962)). Indigent persons charged with Class B misdemeanors in New Hampshire have no right to court-appointed counsel either at trial or on appeal. *State v. Westover*, 140 N.H. 375, 378 (1985). Although New Hampshire recognizes a right to jury trial in cases where the amount in controversy exceeds $1,500, N.H. Const. Pt. 1, Art. 20, there is no right to jury trial for a Class B misdemeanor when the defendant faces no possibility of incarceration, *State v. Foote*, 149 N.H. 323, 324 (2003).

Given the summary process afforded to persons charged with misdemeanors in New Hampshire, the broad sweep of the Criminal Defamation Law encourages arbitrary and selective enforcement, as Mr. Frese's most recent prosecution demonstrates. The Department initiated the prosecution after detectives saw comments on the Exeter Newsletter's website stating that the Exeter police chief "covered up for [a] dirty cop," and subsequently found similar comments on Mr. Frese's Facebook page. Compl. ¶ 14. One of the detectives spoke with Chief Shupe, who expressed concern about the comments. *Id.* ¶ 16. The detective also spoke with Mr. Frese, who provided specific examples to support his statement. It was clear that Mr. Frese believed these statements. Compl., Ex. C Pt. 1, EXE 026 (Arrest Warrant Affidavit ¶¶ 7–9). The detective nonetheless initiated a criminal prosecution against Mr. Frese and obtained a warrant for his arrest. *Id.*, EXE027.

After the case generated significant controversy, *id.*, Ex. C Pt. 2, EXE069–70, Chief Shupe asked whether the NHDOJ "would be willing to prosecute the case," *id.* EXE111. The

NHDOJ responded that the Department had inappropriately "arrested and charged Frese without probable cause of actual malice—that is, that he made the statements at issue with knowledge that they were false." *Id.*, Ex. C Pt. 1, EXE011. Instead, the detective "expressly stated in his report that he brought the charge against Frese because there was no credible information that Frese's statements were true," even though "this is not the legal standard." *Id.*, EXE013. Chief Shupe said he would "not fly in the face of the AG's office," *id.*, EXE110, and the Department dismissed the charges against Mr. Frese, Compl. ¶ 25. Had Mr. Frese's case received less public attention, had the Department failed to receive or follow the NHDOJ's advice, or had Mr. Frese pleaded guilty before the NHDOJ weighed in, the case may have reached a different conclusion.[9]

The decision to bring a criminal charge is the most consequential exercise of discretion in any prosecution; it is also "that part of the prosecutor's discretion which carries with it the greatest potential for misuse." Andrew Horwitz, *Taking the Cop out of Copping a Plea: Eradicating Police Prosecution of Criminal Cases*, 40 Ariz. L. Rev. 1305, 1309 n.20 (1998) (internal quotation marks omitted) (quoting Wayne R. LaFave, *The Prosecutor's Discretion in the United States*, 18 Am. J. Comp. L. 532, 537 (1970)). The potential for misuse is especially high in police prosecutions, both because police officers lack the "legal expertise . . . required . . . to make that decision appropriately," and because police officers are not "bound by various [ethical] rules concerning conflicts of interest," which apply to attorneys. *Id.* at 1309, 1311. A police officer or police department that is the "victim" of a potentially defamatory statement "is

---

[9] Nor is Mr. Frese's case the first reported decision of a New Hampshire police department initiating a criminal defamation prosecution against someone who has criticized one of its officers. In *Nevins v. Mancini*, the plaintiff alleged that the Bennington Police Department unlawfully threatened and then prosecuted him for criminal defamation after he sent complaints to state officials about the conduct of one of its officers. 1993 WL 764212, at *1–2 (D.N.H. Sept. 3, 1993). Although the court noted the "questionable constitutionality" of the Criminal Defamation Law, *id.* at *9 n.8, it held that the defendant police chief was entitled to qualified immunity, *id.* at *9.

not likely to view a case in the same fashion as would an attorney without any personal connection to the case." *Id.* at 1313. But "[w]hile a prosecuting attorney must recuse himself or herself from a case in which he or she has a conflict of interest, a police prosecutor is not bound by any similar rule." *Id.* In Mr. Frese's case, for example, the local prosecutors were conflicted out due to their relationship with the Department and Chief Shupe, Compl., Exhibit C Pt. 2, EXE 114, but that did not prevent the Department's detective from bringing charges and arresting Mr. Frese on his own initiative.

As Mr. Frese's case further demonstrates, law enforcement officers are likely to jump from the belief that a person is obviously wrong to the assumption that the person must be lying, especially when that person is criticizing a friend or colleague. The human tendency to make such logical leaps is understandable, but it is legally insufficient to establish probable cause. *See Nevins*, 1993 WL 764212, at *7 ("[K]nowledge of falsity may not be inferred solely from the falsity of the information communicated." (citing *Bose Corp.*, 466 U.S. at 511)). People often say things that are false, sometimes even obviously false, with total sincerity. Law enforcement officers who initiate misdemeanor criminal prosecutions are not often likely to appreciate the distinction between obvious inaccuracy and intentional lying. *See Susan B. Anthony List*, 573 U.S. at 163; *Alvarez*, 567 U.S. at 736 (Breyer, J., concurring in the judgment). Although such prosecutions may collapse on close scrutiny, a Class B misdemeanor prosecution charge is not likely to receive significant legal scrutiny, especially if it results in a guilty plea.

Once a charge is brought, the defendant will be under intense pressure to plead guilty, regardless of the merits, to avoid further embarrassment, heightened fines, and other consequences. An uncounseled misdemeanor defendant will be informed "that they are charged with a crime—the definition of which they may not know or understand—and told what

resolution the government wants." Natapoff, 85 S. Cal. L. Rev. at 1345. Most people will simply succumb to that pressure to avoid further proceedings. Additionally, "the 'evidence' of a misdemeanor defendant's guilt," especially in a criminal defamation case, "will often be no more than a police officer's assertion." *Id.* at 1346. "In order to contest their guilt, the defendant's word would have to be believed over that of the officer, an outcome that many poor minority defendants rightly dismiss as unrealistic," *id.* (footnote omitted)—especially if the officer is acting as both witness and prosecutor in front of a judge who knows the officer well, as opposed to a jury. Given these realities, it is all too easy to imagine a defendant pleading guilty to a bogus criminal defamation charge brought by an aggrieved police department. Thus, the Criminal Defamation Law may often "be applied where it should not be applied, for example, to bar stool braggadocio or . . . to speakers that the Government does not like," risking "significant First Amendment harm." *Alvarez*, 567 U.S. at 737 (Breyer, J., concurring in the judgment).[10]

The Criminal Defamation Law's extensive reach and minimal procedural protections entrust too much discretion "to the moment-to-moment judgment of the policeman on his beat." *Kolender*, 461 U.S. at 360 (internal quotation marks omitted) (quoting *Smith,* 415 U.S., at 575). It "confers on police a virtually unrestrained power to arrest and charge persons with a violation," and thereby "furnishes a convenient tool for harsh and discriminatory enforcement"

---

[10] This is in marked contrast to civil defamation claims. A plaintiff is unlikely to invest the resources necessary to file a civil defamation lawsuit against a judgment-proof defendant. Thus, in any civil defamation case of significant value, both parties will often have both the resources and the inclination to obtain counsel, as well as the right to trial by jury. If such a case settles, it will usually be without any admission of fault or liability. In misdemeanor prosecutions under the Criminal Defamation Law, which are brought without regard to the defendant's ability to satisfy a judgment, the defendant has no right to counsel and often lacks the resources necessary to afford one. The result is that a criminal defamation charge is rarely subject to any meaningful adversarial process, and that defendants may be *convicted* under the Criminal Defamation Law for speech that is in fact constitutionally protected, either because it is not intentionally false or because it is not legally defamatory.

against individuals who criticize law enforcement officers. *Id.* (citations and internal quotation marks omitted). As Mr. Frese's criminal prosecution demonstrates, the temptation for police officers to bring criminal defamation charges against those who criticize their friends and colleagues will often be hard to resist. People who do not wish to invite such prosecutions will inevitably refrain from engaging in political expression lying at the core of the First Amendment. This is the sort of arbitrary and discriminatory exercise of power that the Constitution prohibits.

<u>**CONCLUSION**</u>

For the foregoing reasons, the State's Motion to Dismiss should be denied.

Respectfully submitted,

ROBERT FRESE,

By and through his attorneys affiliated with the American Civil Liberties Union of New Hampshire Foundation and the American Civil Liberties Union Foundation,

*/s/ Gilles Bissonnette*
Gilles R. Bissonnette (N.H. Bar. No. 265393)
Henry R. Klementowicz (N.H. Bar No. 21177)
AMERICAN CIVIL LIBERTIES UNION OF NEW HAMPSHIRE
Concord, NH 03301
Tel.: 603.224.5591
gilles@aclu-nh.org
henry@aclu-nh.org

Brian Hauss*
Emerson Sykes*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Speech, Privacy, and Technology Project
125 Broad Street, 18th Floor
New York, NY 10004
Tel.: 212.549.2686
bhauss@aclu.org
esykes@aclu.org

John M. Greabe (N.H. Bar No. 18706)
296 Gage Hill Road
Hopkinton, NH 03229
Tel.: 603.513.5191
jgreabe@yahoo.com

Lawrence A. Vogelman, Esq. (N.H. Bar No. 10280)
NIXON, VOGELMAN, BARRY, SLAWSKY & SIMONEAU, P.A.
77 Central Street
Manchester, NH 03101
Tel.: 603.669.7070
lvogelman@davenixonlaw.com

*Admitted *pro hac vice*

Date:   May 2, 2019

## CERTIFICATE OF SERVICE

     I hereby certify that a copy of the foregoing was served this 2nd day of May, 2019, on all counsel of record, via the ECF System.

                             */s/ Gilles Bissonnette*
                             Gilles Bissonnette